IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ATHENA LOUISE LARK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-12-481 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION,[1] | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 9), and Memorandum in Support (Document No. 10), Defendant's Motion for Summary Judgment (Document No.11) and Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 12). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 9) is DENIED, and the

---

[1] Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this action.

[2] The parties consented to proceed before the undersigned Magistrate Judge on August 6, 2012. (Document No. 8).

decision of the Commissioner is AFFIRMED.

## I.  Introduction

Plaintiff, Athena Louise Lark ("Lark") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability benefits.  Lark argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Daniel E. Whitney, committed errors of law when he found that Lark was not disabled. Lark argues that she has been disabled since September 1, 2008, due to depression, panic attacks, anxiety, and insomnia.  (Tr.  128-134).  According to Lark, the ALJ  erred in his rejection of the opinion offered by her psychiatrist at the Houston, Texas VA, Dr.  Truong.  She argues that Dr. Truong's opinions are consistent with the record as a whole and should have been given controlling weight especially when compared to the opinion of Dr. Tadros, who performed a one time consultative examination of Lark, without the benefit of reviewing her medical records, and of disability determination unit physicians reviewing her medical records.  Lark further argues that the ALJ failed to properly evaluate her credibility.  Lastly, Lark contends that the ALJ relied on flawed vocational expert testimony because it was premised on the ALJ's residual functional capacity (RFC) finding that was not supported by the record.  Lark seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Lark was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II.  Administrative Proceedings

On July 13, 2009, Lark filed for disability insurance benefits claiming she has been disabled since September 1, 2008 . (Tr. 128-129). The Social Security Administration denied her application at the initial and reconsideration stages. (Tr.43-46, 48-52). Lark then requested a hearing before an ALJ. (Tr. 53-54). The Social Security Administration granted her request, and the ALJ held a hearing on May 31, 2011. (Tr. 21-40). On June 22, 2011, the ALJ issued his decision finding Lark not disabled. (Tr.10-20). In his decision, the ALJ found that Lark was not disabled at any time from February 15, 2006, through the date he issued his decision.

Lark sought review by the Appeals Council of the ALJ's adverse decision. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Lark's contentions, including medical records from the Veteran Administration Hospital, Houston, Texas from April 12, 2011 and July 19, 2011, and a psychiatric/psychological impairment questionnaire completed by Frank Stransky on October 31, 2011, in light of the applicable regulations and evidence, the Appeals Council, on December 21, 2011, concluded that there was no basis upon which to grant Lark's request for review. (Tr. 1-4). The ALJ's findings and decision thus became final.

Lark has timely filed her appeal of the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment (Document No. 11). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 9), to which Defendant has filed a Response. (Document No. 12). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 468.  (Document No. 4).  There is no dispute as to the facts contained therein.

### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision.  *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305

U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  *Id.*  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.*  § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2.  If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his June 22, 2011, decision that Lark was not disabled because she could perform her past relevant work. In particular, the ALJ determined that Lark had not engaged in substantial gainful activity since February 15, 2006 (step one); that Lark's bipolar disorder and depressive disorder were severe impairments (step two); that Lark did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); based on the medical records, and the testimony of Lark, Lark had the RFC to perform a full range of work at all exertional levels but with

the following nonexertional limitations: "the claimant is able to understand, remember, and carry out detailed instructions and make judgments on detailed work related decisions; and she could frequently interact with the general public, coworkers, and supervisors." (Tr. 17). The ALJ further found that based on Lark's RFC, and the testimony of a vocational expert about Lark's prior work, that Lark could perform her past relevant work as a radioman, as a receptionist, and as an officer clerk and was not disabled within the meaning of the Act (step four). As a result, the Court must determine whether substantial evidence supports the ALJ's step four finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

The objective medical evidence shows that Lark has been treated for depression, panic attacks, anxiety and insomnia. Lark served in the United States military from 1989 to 1995. Because of her military service, most of Lark's treatment records are from the Department of Veterans Administration (VA) in California and later in Texas.

By history, the records show that Lark attempted suicide on July 15, 1979, and on August 5, 1989, by cutting her wrists, and she ingested pills while stationed in Guantanamo Bay in 1989. The earliest summary of Lark's mental health history and treatment was written by Akua Owusu, M.D. on October 29, 2007. Dr. Owusu worked at the Life Counseling Center. With respect to Lark's treatment, Dr. Owusu wrote:

I have been treating Ms. Lark since March 2005, for a diagnosis of recurrent major

depression.   Symptoms have included sleep and appetite problems, feelings of hopelessness and helplessness, irritability, loss of motivation and anxiety attacks, characterized by fear, palpitations, and sweating.  Ms.  Lark is on a combination of Wellbutrin,[3] Lexapro,[4] Ambien[5] and Klonopin[6].  She has shown improvement on the above combination, but does still continue to have residual symptoms.  (Tr.  302).

From December 1, 2008 through September 24, 2009, Lark was treated by Nicodemus J. Garcia, M.D.  Dr.  Garcia's initial evaluation of Lark on December 5, 2008, reflects that she had a GAF of 75.[7]  Lark controlled her symptoms with Wellbutrin, Lexapro, and Lunesta.[8]  (Tr.  263-268). Dr.  Garcia's treatment note from February 21, 2009,  shows that Lark reported doing well on her "meds" except for Lunesta, which was not helping her fall asleep. Dr. Garcia switched Lark from

---

[3] Wellbutrin (generic name: Bupropion) "is used to treat major depressive disorder." PDRhealth, avail. at http://www.pdrhealth.com/drugs.

[4] Lexapro (generic name: Escitalopram) "belongs to a class of drugs called selective serotin reuptake inhibitors (SSRIs). Lexapro is used to treat major depressive disorder and anxiety disorder." PDRhealth, avail at http://www.pdrhealth.com/drugs.

[5] Ambien (generic name Zolpidem) "is used for short-term treatment of insomnia specifically for people who have trouble falling asleep at bedtime." PDRhealth, avail at http://www.pdrhealth.com/drugs.

[6] Klonopin (generic name: Clonazepam) "is an antianxiety medication belonging to a group of drugs called benzodiazepines. Klonopin is used alone or with other drugs to treat seizure disorders. It is also used to treat panic disorders." PDRhealth, avail at http://www.pdrhealth.com/drugs.

[7] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. Text rev 2000 (DSM-IV) at 32. A GAF score of 75 suggests "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).

[8] Lunesta (generic name: Eszopiclone) "belongs to a group of medicines known as sedative/hypnotics, or sleep medicines. Lunesta is used for the treatment of insomnia, specifically for people who have trouble falling asleep, who wake up often during the night, or who have both of these sleep problems." PDRhealth, avail at hppt://www.pdrhealth.com/drugs.

Lunesta to Ambien.  Lark reported being busy writing a memoir.  (Tr.  262).  Lark was next seen by

Dr.  Garcia on June 5, 2009.  (Tr.  261).  She was tearful, reported having panic attacks and stated

she wanted a different psychiatrist.  (Id.).  The last treatment note from Dr.  Garcia on September 24,

2009, reveals that Lark was still struggling with depression.  Dr.  Garcia suggested a change in

medications, namely that Lark taper off Lexapro. (Tr.  260).

     Lark underwent a psychological evaluation by Allen Lee, M.D. on July 16, 2009.  (Tr.  255-

258).  Lark told Dr. Lee that her mental health issues began when she was seventeen and the issues

had made her socially isolated.  Lark reported being hospitalized in 1979 following a suicide attempt

that involved wrist cutting. She complained of panic attacks especially when driving. The results of

Lark's mental status examination confirmed she was depressed. (Tr.  257).  Dr.  Lee wrote that Lark

had no abnormal thought process, was able to read and understand and had no slowness of thought,

she was not confused, her judgment was good, she could think abstractly, and had no thoughts of

suicide or homicide.  Dr.  Lee opined that Lark had major depression with panic attacks. She had a

GAF score of 60.[9]  (Tr.  258).  Based on this diagnosis of major depression with panic attacks, Dr.

Lee noted that Lark's psychiatric symptoms would cause occupational and social impairment with

reduced reliability and productivity due to Lark's disturbances of motivation and mood, difficulty

in establishing and maintaining effective work and social relationships, and panic attacks.  According

to Dr.  Lee, Lark required medication management and psychotherapy.  Dr.  Lee described Lark's

prognosis as "fair."  (Tr.  258).

     In August 2009, the VA officially changed Lark's diagnosis to Bipolar I. This change resulted

_____

[9]A GAF of 60 is at the top of the range 51-60. A score in this range indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 34.

in an increase in her VA disability rating from 30% to 50%. (Tr. 303-329).

On October 5, 2009, Lark underwent a consulting psychiatric examination by Emad Tadros M.D (Tr. 271-273). Dr. Tadros did not review any of Lark's medical records in connection with his evaluation of Lark. Lark reported having problems concentrating, that her memory was poor, that she had insomnia, had poor interpersonal skills, had anxiety and was socially isolated. She did, however, report being "pleased with her medications." (Tr. 271). The results of her mental status examination follow:

> **Attitude and Behavior:** The claimant's posture, gait, and mannerisms were within normal range. Social interaction with this evaluator was normal. The claimant put forth good effort into the evaluation. In general, the claimant's speech was normal rate, rhythm, and tone with no aphasia or latency noted. This evaluator could understand 100% of the claimant's verbalizations. Psychomotor activity was normal. The claimant had good, pleasant, polite eye contact.

> **Orientation/Attention/Memory**: The claimant was oriented to the month, date, year, and city of the evaluation. The claimant could complete serial sevens with speed and accuracy. The claimant was not easily distracted and needed no structure from this evaluator during the evaluation. The claimant's memory was intact. The claimant was able to recall adequate details regarding her personal history.

> **Abstractions and Judgment:** When asked about similarities between an apple and an orange, the claimant stated, "They both are round." When asked to interpret the proverb "Two heads are better than one," the claimant answered, "Better to get the advice of others when making decisions."

> **Affective Status:** When asked to described her mood, the claimant replied, "I feel so-so." This evaluator observed her affect as being mildly restricted due to depression, no lability, appropriate, and related to mood. The claimant's affect was full and neutral during the interview. The claimant has a history of suicidal ideation and attempt which led to her hospitalization in the past, but denies current suicidal ideation or intent. The claimant denies a history of homicidal ideation.

> **Reality Contact:** The claimant's thought processes were logical and goal-oriented. History does not indicate hallucinations. The claimant was not exhibiting florid, nor subtle psychotic behavior during today's interview.

> **Current Level of Functioning, as Reported by Historian:** The claimant is able to take care of personal hygiene. The claimant can take care of chores such as: cooking,

washing, cleaning. The claimant's hobbies include: reading, watching TV or talk on the phone with friends and take bus rides for fun. The claimant is able to drive. The claimant is able to utilize public transportation independently. The claimant handles her own funds. (Tr. 272).

Based on Lark's mental status examination, Dr. Tadros characterized Lark as having "slight limitations' in the ability to complete detailed tasks; ability to complete complex tasks; and ability to concentrate for at least two-hour increments at a time, in order to maintain a regular work schedule. As to Lark's ability to handle funds, Dr. Tadros opined that she was "capable." He found she had "no limitations" in the ability to socially interact with others at an age-appropriate level as demonstrated with this evaluator; she was able to understand instructions, as demonstrated with this evaluator; ability to sustain an ordinary routine without sustained supervision; ability to complete simple tasks; ability to complete detailed tasks; and ability to avoid normal hazards. (Tr. 272). Dr. Tadros summarized his findings as follows:

> In summary, this claimant is clearly suffering from a psychiatric diagnosis that needs attention and further medication adjustments. She interacted extremely well during the interview. I do not see any deficits that would interfere with her doing at least a part-time job, if not a full-time job in the long run. At this point, she is pleased due to the fact that she is receiving a VA pension in addition to her alimony. She would benefit best from being out in the workforce doing something as soon as possible. The fact that she has been approved for a VA pension does not necessarily mean that this claimant is totally disabled. (Tr. 273).

Dr. Tadros diagnosed Lark as having bipolar manic depressive disorder by history most recently mild. Lark had a GAF of 50-60.[10]

In connection with her application for benefits, a disability determination unit physician, G. Rivera-Miya, reviewed Lark's medical records and completed a psychiatric Review Technique on October 22, 2009 (Tr. 274-282), and a case analysis, which summarized Lark's functional

---

[10] The GAF score of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 34.

information, and significant objective findings that reflected Lark had a GAF of 75 on December 5, 2008, a GAF of 60 on July 16, 2009, and a GAF of 50-60 on October 5, 2009.  (Tr. 285-86).  Dr. Rivera-Miya opined that Lark had a medically determinable impairment "BMD, Depressed-Mild." (Tr. 277).  With respect to the "B" criteria for rating functional limitations, Dr. Rivera-Miya found that Lark had no repeated episodes of decompensation, each of extended duration.  In addition, she rated as "mild" Lark's functional limitations in the following areas: restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace.  (Tr. 282).  Finally, Dr. Rivera-Miya concluded that nothing in Lark's medical records established the presence of the "C" criteria.  (Tr. 283).  Another disability determination unit physician, R. Paxton, M.D. concurred with Dr. Rivera-Miya's case analysis on January 25, 2010. (Tr. 294-296).

The medical notes from the West Los Angeles VA show that Lark was treated by Young Mee Choi, M.D in 2010.  The notes from Lark's initial visit show that Lark told Dr. Choi that she suffers from depression, anxiety, and insomnia.  (Tr. 355).  Lark reported that her activities include reading and little socialization.  (Tr. 356).  She had a GAF score of 41-50.[11]  Dr. Choi attributed this lower GAF score range to interpersonal and socialization issues.  (Tr. 363).  Lark was next seen by Dr. Choi on March 25, 2010.  (Tr. 351-353).  Lark reported that she felt "a little off" but noted she had been forgetting to take the evening dose of bupropion. (Tr. 351).  In summary, Dr. Choi wrote "[s]he has some depressive symptoms relief on her current medications but has difficulty socially and in work settings. Her description of her previous psychotherapies suggest interpersonal and socialization issues." (Tr. 352).  At Lark's next appointment on May 7, 2010, she reported that she

---

[11]A GAF score of 41-50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

felt "maybe a little worse with ongoing anxiety, isolation and low mood." (Tr. 345).  Dr.  Choi opined that such feelings were related to Lark's finances and loneliness. Dr. Choi suggested that Lark consider attending a community day program for structure and socialization skills. Also, Dr. Choi instructed Lark not to nap during the day so she might be able fall asleep without Ambien. The notes from Lark's next appointment on June 17, 2010, show that Lark had not remembered what Dr. Choi had told her about not napping during the day. Again, Dr.  Choi reinforced that Lark was not to nap during the day and they discussed "sleep hygiene." (Tr. 343-345).  Lark sought emergency medical attention on June 28, 2010, because she thought she was having a heart attack.  Dr.  Choi described it as "acute anxiety."  (Tr.  339).  Lark subsequently decided to relocate to Texas to be closer to family.  At Lark's final appointment with Dr.  Choi on September 24, 2010, they discussed Lark's ongoing feelings of loneliness and avoidance.  Dr.  Choi encouraged Lark to contact the VA after she moved. (Tr. 335-338).

After Lark's relocation to Houston, Texas, she was treated by Elizabeth Truong, M.D. at the VA.  The treatment note from Lark's initial office visit on October 26, 2010, reveals that Lark had a GAF score of 62.[12]  Dr. Truong suggested that Lark try a medication other than Wellbutrin, which Dr. Truong felt was increasing both Lark's level of anxiety and insomnia. (Tr.  393, 395, 397, 402). Dr. Truong again discussed a medication change with Lark on January 4, 2011.  (Tr.  387-396). Lark had a GAF score of 60.

Dr.  Truong completed a Psychiatric/Psychological Impairment Questionnaire on April 12, 2011.  (Tr.  429-436).  Dr.  Truong stated that she had been treating Lark since October 26, 2010,

_____

[12] A GAF score of 61-70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV at 34.

and she had last met with her on April 12, 2011 or approximately every two to three months.  Dr. Truong diagnosed Lark as having depression NOS, anxiety, and bipolar Type II disorder.  She had a GAF of 55.[13]  With respect to Lark's prognosis, she wrote: "progress is guarded, as she has a chronic mental illness.  Difficulty handling stressful situations." (Tr. 429). Dr. Truong based this prognosis on the following: Lark's poor memory, appetite disturbance with weight change, sleep disturbance, recurrent panic attacks, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy and generalized persistent anxiety.  (Tr. 430).  Turning first to Lark's functional ability relating to understanding and memory, Dr.  Truong found Lark was "moderately limited" in three areas: the ability to remember locations and work-like procedures; the ability to understand and remember one or two step instructions; and the ability to understand and remember detailed instructions.  (Tr. 432).  Next, Dr.Truong rated Lark's ability to maintain sustained concentration and persistence. Dr Truong found that Lark was "moderately limited" in her ability to carry out simple one or two step instructions; her ability to carry out detailed instructions; and her ability to make simple work related decisions.  In all other areas, Dr.  Truong described Lark as "markedly limited."  Areas where Lark was "markedly limited" included: the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; the ability to sustain ordinary routine without supervision; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  The next area rated by Dr.Truong was social

---

[13] A GAF score of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 34.

interactions.  Lark was deemed "moderately limited" in her ability to ask simple questions or request assistance; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Lark was rated by Dr. Truong as being as "markedly limited" in the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. As to Lark's ability to adapt, Dr. Truong rated Lark as being "moderately limited" in the ability to set  realistic goals or make plans independently. In other areas such as the ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; and the ability to travel to unfamiliar places or use public transportation she was rated as being "markedly limited." The questionnaire also asked whether Lark was a malingerer. Based on her treatment of Lark, Dr. Truong responded that Lark was not a malingerer. Because of Lark's severe anxiety and panic attacks, Dr.  Truong opined she was incapable of low stress jobs and that her employability was further limited due to the fluctuating nature of her severe anxiety and panic attacks, which would result in Lark having good days and bad days.

Here, substantial evidence supports the ALJ's finding that Lark's bipolar disorder and depressive disorder were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment.  In addition, substantial evidence supports the ALJ's finding that Lark retained the RFC for a full range of work at all exertional levels but with the following nonexertional limitations: that she could understand, remember, and carry out detailed instructions and make judgments on detailed work related decisions; and frequently interact with the general public, coworkers and supervisors. Upon this record, the ALJ's RFC determination  is consistent with Dr. Lee's and Dr. Tadros' evaluations, and

the treatment records of Lark's treating physicians, Dr. Choi and Dr. Truong.  The ALJ, based on the totality of the evidence, concluded that Lark could perform a full range of work at all exertional levels but with nonexertional limitations, and gave specific reasons in support of this determination. This factor weighs in favor of the ALJ's decision.

### B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'"  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)).  The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.  *Id.*   "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'"  *Martinez,* 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical

opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight to be given  "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion." *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician

can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v. Barnhart,* 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in administrative proceedings is not required.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately.  The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

Lark contends that the ALJ erred by failing to adequately explain the weight given to the opinions of  Dr.  Truong, Lark's treating psychiatrist or to adequately explain why Dr.  Truong's opinions were not entitled to controlling weight.  Lark argues the ALJ erred by giving "great weight" to the opinions from a one-time examining psychiatrist, Dr.  Tadros, and generally concurring with the opinions from non-examining State agency consultants.  Lark maintains that Dr.  Truong's opinions were well-supported by her own clinical and subjective findings and were consistent with the other medical records that showed Lark's ongoing problems with anxiety, panic attacks, depression and insomnia and her need for a "multiplicity of medication" as described by Dr. Tadros to control her symptoms.  Lark further argues that subjective comments made by her to Dr. Truong such as reporting she was doing better or taking college courses on-line were not inconsistent with Dr. Truoung's Questionnaire responses concerning Lark's functional limitations based on her diagnosis of bipolar disorder and depressive disorder.  The Commissioner responds that ALJ properly weighed the medical opinions and performed an analysis of the opinion evidence.

According to the Commissioner, the ALJ summarized the medical evidence and explained the weight accorded to the opinions of the medical sources. Additionally, the Commissioner argues the ALJ set forth specific reasons for the weight given to Dr. Tadros' consultative examination as well as the opinions of the disability physicians who reviewed Lark's medical records. With respect to Dr. Truong's questionnaire responses, while acknowledging the existence of a treating relationship between Lark and Dr. Truong, the ALJ, nevertheless, noted that it had been brief and that questionnaire responses were inconsistent with her own records, and as a result, made her conclusions "less persuasive." The Commissioner further argues that the ALJ's RFC is consistent with the medical source opinions which showed Lark could maintain work and social relationships.

With respect to the opinions and diagnoses of treating physicians and medical sources, the ALJ wrote:

> On October 5, 2009, a psychiatric consultative examination was conducted by Board Certified Psychiatrist, Enad Tadros, M.D. The claimant reported to Dr. Tadros that she had reduced concentration with poor energy, insomnia, poor interpersonal skills, social isolation, and anxiety. However, the claimant denied any hopelessness, helplessness, or worthlessness; she denied any temper or out of control behaviors; she had no psychosis or command hallucinations; she had no major somatic complaints; she had no acute medical problems; she had no major neurological deficits; she had no recent history of loss of consciousness, seizures, or head trauma; and she stated that she felt like a 10 on a scale of 1-10 with 10 being the best after taking her medications. In addition, Dr. Tadros noted at that time that the claimant only had a 50% disability rating. On review, Dr. Tadros stated that social interaction with the claimant was normal; the claimant had good, pleasant, polite eye contact; she was oriented; she could complete serial seven's with speed and accuracy; she was not easily distracted and needed no structure from the evaluator during the evaluation; her memory was intact; she was able to recall adequate details regarding her personal history; her mood was mildly restricted due to depression; her affect was full and neutral during the interview; she denied current suicidal ideation or intent; and her thought processes were logical and goal oriented (Exhibit 3F).

> Accordingly, Dr. Tadros diagnosed the claimant as having bipolar manic depressive disorder, by history, most recently mildly with no psychosis noted; and assigned the claimant a global assessment of functioning (GAF) score of 50-60. A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational,

or school functioning. *See Diagnostic and Statistically Manual of Mental Disorders*, (DSM-IV) at page 34 (fourth edition, text revision, 2000) (American Psychiatric Association).  Due to her impairments, Dr. Tadros opined that the claimant had no limitations in her ability to socially interact, in her ability to understand instructions, in her ability to sustain an ordinary routine without sustained supervision, and in her ability to complete simple tasks; slight limitations in her ability to complete detailed or complex tasks, and in her ability to concentrate for at least two-hour increments at a time; she had no limitations in her ability to avoid normal hazards; and she was capable of handling funds (Exhibit 3F).

The record further contains numerous office notes reflecting regular trips to the Veterans Affairs (VA) Medical Center for relief for her alleged symptoms. However, that treatment was essentially routine and conservative in nature.  Specifically, the record indicates that the claimant presented to the VA Hospital in February 2010 complaining of depression, anxiety, and insomnia.  On mental status examination, the claimant was diagnosed as having depressive disorder, not otherwise specified; and bipolar disorder by history.  In subsequent treatment notes dated September 16, 2010, the claimant reported that she had been "alright" and she had not had any more panic attacks; in treatment notes dated October 26, 2010, a mental status examination was essentially normal (with the exception of an anxious mood and constricted affect) and the claimant's GAF score was noted to be 62, which is indicative of mild symptoms only; and in treatment notes dated January 4, 2011, the claimant was said to be doing well and working on her Masters degree (Exhibit 11F, 12F, 14F).

At the hearing, the claimant testified that she is unable to work due to anxiety, difficulties dealing with other people, panic attacks, depression, and an inability to work under pressure.  Due to her impairments, the claimant testified that she loses concentration easily and she does not go out much.  However, the claimant testified that she walks her dog, she cleans her house, she reads, and she sews.  In addition, the claimant testified that she helps take care of her 30-year-old son who suffers from schizophrenia without any particular assistance.  The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  Moreover, as mentioned earlier, the record reflects work activity after the alleged onset date.  Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported.

One of the claimant's treating physicians at the VA Hospital, Elizabeth Truong, M.D., opined that, due to the claimant's impairments, she was incapable of even a low stress job.  In addition, Dr. Truong opined that the claimant would miss more than three days of work per month as a result of her impairments.  However, I note that Dr. Truong's records contain inconsistencies, which render her opinions less persuasive.  Particularly, Dr. Truong assigned the claimant a GAF score of 55 (which is indicative of moderate symptoms only); and, as mentioned above, Dr.

Truong's notes indicated that the claimant was doing well and working on her Masters degree (Exhibits 12F, 13F).  Moreover, although Dr.  Truong does have a treating relationship with the claimant, the treatment history is quite brief.

After careful consideration of the evidence, I find that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

As for the opinion evidence, I assign great weight to the opinion of Dr.  Tadros as outlined above due to the fact that it is consistent with the record as a whole.  In addition, I generally concur with the State Disability Determination Services (DDS). Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (Exhibit 4F, 5F, 6F, 7F).

Upon evaluation of all the evidence of the record and assessment of the claimant's allegations, I find that the claimant has the residual functional capacity assigned above based on the totality of the objective medical evidence of record.  (Tr.  18-20).

As to Lark's contention that the ALJ erred by discounting Dr.  Truong's opinion without giving sufficient detail about the weight given the opinion or basis for not giving her opinion controlling weight, the ALJ explained his rationale for finding Dr. Truoung's opinion probative but not persuasive given the inconsistencies between Dr. Truong's Questionnaire responses, and Dr. Truong's treatment notes from Lark's three treatment sessions (October 26, 2010, January 4, 2011, and April 12, 2011), and the record as a whole. For instance, at Lark's January 4, 2011, appointment, Lark reported that her anxiety had not worsened. Overall, Dr. Truong wrote that Lark's condition had shown a little improvement following a medication change. (Tr. 389-391). Lark further reported she was taking courses on-line for her Masters degree. (Tr. 384).  She also had a GAF score of 55, which indicated the presence of moderate symptoms. The treatment notes from the three appointments do not show that Lark's depressive disorder and bipolar disorder resulted in her being

"markedly limited" in all the areas identified by Dr. Truong in the Questionnaire.  Moreover, neither opinions by Dr.Truong or Dr. Lee about Lark's employability due to the fluctuating nature of her bipolar/panic attacks were binding on the ALJ. The law is clear that "among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'" *Frank v.  Barnhart*, 326 F3d 618, 620 (5th Cir. 2003).

The ALJ's decision is a fair summary and characterization of the medical records. Given the proper discounting of the opinion of Dr. Truong on the ultimate issue of disability, and the medical opinions which do support the ALJ's residual functional capacity determination, upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range

of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

Here, Lark testified about her health and its impact on her daily activities. She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition. Lark testified that she lives with her 30 year old son who has schizophrenia and is unemployed. (Tr. 31). Lark testified that she drives, yet later testified she avoids driving because it makes her anxious. (Tr. 31, 38). According to Lark, she is unable to work because "well I don't do well under pressure, my anxiety is horrible. I move kind of slow, I'm not good around people so I become socially isolated and I have panic attacks pretty, pretty often." (Tr. 33). She is not "cheerful." (Tr. 34). Lark testified about triggers of her panic attacks. Lark stated the panic attacks come up "unexpectedly" and that a small amount of stress triggers an outbreak of anxiety. (Tr. 34). Leaving her house causes her anxiety level to spike so much that she has to take an anxiety pill to calm her nerves. (Tr. 38). Because of this, Lark described herself as a homebody and socially isolated. (Tr. 35, 36). She further testified she dislikes being around people that have issues and "lots of drama", including her son who has schizophrenia. (Tr. 38-39). Lark's daily activities include house work, reading, and walking her dog.

Based on the reasons which follow, the ALJ rejected Lark's testimony as not fully credible:

At the hearing, the claimant testified that she is unable to work due to anxiety, difficulties dealing with other people, panic attacks, depression, and an inability to work under pressure. Due to her impairments, the claimant testified that she loses concentration easily and she does not go out much. However, the claimant testified that she walks her dog, she cleans her house, she reads, and she sews. In addition, the claimant testified that she helps take care of her 30-year-old son who suffers from schizophrenia without any particular assistance. The claimant has described daily

activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Moreover, as mentioned earlier, the record reflects work activity after the alleged onset date. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported.

*    *    *

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the symptoms; however, the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. (Tr. 19).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. The ALJ found Lark not credible regarding her daily activities. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Cheryl Swisher, a vocational expert ("VE"), at the hearing about Lark's past relevant work as a radioman, receptionist, and office clerk. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).

It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling,* 36 F.3d at 436.

The ALJ posed the following hypothetical questions to the VE:

Q. Ms. Swisher, for all hypotheticals assume a person of the same age, education and work history as the claimant. Assume a person limited to understand, remember and carry out detailed instructions, make judgments on detailed work related decisions, frequent interaction with the public, coworkers and supervisors. Based on those limitations alone would such a person be able to perform any of the claimant's past work?

A. One moment, Your Honor. Before I answer that question I need to clarify a job that I gave you. The clerical job the specific title is general office clerk, it's commonly performed at light, she performed it at sedentary, it is semiskilled, SVP: 3, Your Honor. Thank you.

Q. Okay.

A. And your hypothetical, Your Honor, all jobs would still be intact.

Q. If a person is limited to, if they likely be absent from work more, more than three times a month would any past work be available?

A. No, Your Honor, that would require an accommodation by an employer, it's not consistent with competitive employment, Your Honor.

Q. So no other jobs would be available?

A. There would be no other jobs available. (Tr. 39-40).

Lark's counsel declined the opportunity to question the VE.

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert. A

hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Lark was not disabled.  Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Lark could perform her past relevant work because the type of work was consistent with her RFC.  The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Lark was not disabled within the meaning of the Act and therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.  Accordingly, this factor also weighs in favor of the ALJ's decision.

## V.  Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Lark was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No.9), is  DENIED, Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, 4/1/2013

Frances H. Stacy
United States Magistrate Judge